Association of Ship Brokers
& Agents (U.S.A.), Inc.

FILE COPY
CODE WORD FOR THIS
CHARTER PARTY:

October 1977

ASBATANK VOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

SINGAPORE    20th March 2003
Place        Date

IT IS THIS DAY AGREED between __VYZANTIO SHIPPING LTD.__

~~Chartered~~owner/owner (hereinafter called the "Owner") of the __MALTA FLAG - BUILT 1976__

SS/MS __BYZANTIO__ (hereinafter called the "Vessel")

and __FORMOSA PETROCHEMICAL CORPORATION, TAIPEI__ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A. Description and Position of Vessel:

  Loa/Beam: 211.18/32.20 M
  IGS/SBT

  Deadweight: 59,850 metric tons ~~(2240 lbs.)~~    Classed: DNV
                                                    metres
  Loaded draft of Vessel on assigned summer freeboard 13.22 M. M. in salt water.
           cubic metres, excluding slop
  Capacity for cargo: 61,603.8 ~~cu. (of 2240 lbs. each)~~   98 % more or less, Vessel's option.

  Coated:  [X] Yes  [ ] No
                                       three
  Coiled:  [X] Yes  [ ] No    Last ~~two~~ cargoes: Condensate/FO/FO

  Now: Trading                Expected Ready: 23rd March 2003

B. Laydays:

  Commencing: 23rd March 2003         Cancelling: 24th March 2003
  Basis loading Singapore/Karimun; 28th March 2003, basis loading OPL Hong Kong
C. Loading Port(s): One STS Singapore/Karimun range or Charterers' option load one
  STS OPL Hong Kong.

                                                                 Charterer's Option

D. Discharging Port(s): One safe port Mailiao.

                                                                 Charterer's Option

E. Cargo: Charterers' option up to full cargo. One/two gardes within vessel's
  natural segregation. No heat crude. Vessel's intake basis api 30.9 at
  loaded temperature is about 52,000 mt.

F. Freight Rate: Lumpsum USD397,500, basis 1:1                   ~~per ton (of 2240 lbs. each)~~

EXHIBIT
1

G. Freight Payable to: In United States Dollars by Telegraphic Transfer, to Owners' designated bank.

H. Total Laytime in Running Hours: 96 hours

I. Demurrage per day: US$17,000.00 per day or pro rata

J. Commission of ~~3.75~~ % is payable by Owner to 1.25% to Charterers' as address com, 1.25% ~~on the actual amount of freight,~~ when and as freight is paid. to BJSHIP, Spore. ~~deadfreight~~ & demurrage, if any

K. ~~The place~~ of General Average and arbitration proceedings to be London/~~New York~~ (strike out one) under English law

L. Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M. Special Provisions:

Special Provisions and additional clauses Nos. 1 to 5 as attached are deemed incorporated in this Charter Party.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Part I and Part II, to be executed in duplicate as of the day and year above written.

Witness the signature of:

VYZANTIO SHIPPING LTD.

By: _____

FORMOSA PETROCHEMICAL CORPORATION

Witness the signature of:

By: _____

# CPC Charter Party Clauses
# June 1999 Revision

I. ASBA II Tanker Voyage Charter Party with following amendments to apply:

Line 203-208 "Dry Cargo" delete in full
Line 288 delete "1950" insert "1994"
Line 341-349 "Reloading" delete in full
Line 418-449 "Tovalop" delete in full

II. CPC Clauses:

Part A

## 1. LAST PORT OF CALL

Owner warrants that Vessel's last port of call before calling Taiwan is not a port of Mainland China.

## 2. SCRAPPING

Owner guarantees that voyage to be performed shall not be last voyage prior to scrapping of the Vessel.

## 3. ADDRESS COMMISSION

An address commission, 1.25% on the actual amount of freight/deadfreight/demurrage, to Owners under this Charter Party, shall be directly deducted by Charterers while the payment is made. Apart from the address commission, no other commission/rebate, in cash or in kind, or benefit of any kind, shall be paid to any director, employee or agent of Charterer or any of its affiliates.

## 4. SLOPS/FREIGHT

It is understood no freight is payable on slops.

## 5. UNMOORING/BALLASTING

After completion of discharge operation Vessel should be unmoored immediately and if it is necessary to take ballast, this should be done at anchorage provided weather and safety permitting.

## 6. WORLDSCALE REFERENCE

Worldscale terms and conditions shall apply to this Charter Party. Any costs itemized for Charterer's account shall, unless otherwise instructed by Charterer, be paid by Owner and reimbursed by Charterer against Owner's fully documented claim simultaneously with freight.

## 7. GENERAL AVERAGE

York/Antwerp Rules of 1994 to apply.

## 8. SINGLE POINT MOORING (SPM)

Owners warrant that Vessel is equipped to load and discharge at SPM per OCIMF recommendations.

## 9. CLEAN BALLAST

Vessel to arrive loading port with clean ballast.

## 1o. CLAIMS TIME BAR

Charterers shall be discharged and released from all liabilities in respect of any claim for demurrage, deviation, deadfreight, and/or any other amounts, which are for Charterer's account under this Charter. Unless a claim in writing with supporting documentation has been presented to Charterers within ninety (90) days from the date of completion of discharge of cargo.

*90 days for demurrage claim and 120 days for others*

## 11. WEST AFRICA LOADPORTS CLAUSE

If vessel loads cargo(s) at port(s) in West Africa where regulated the vessel has to pay levy, or dues, or taxes on cargo loaded on board the vessel, Owners agrees to pay same in time on behalf of Charterer to the port Authority or Government designated agency so that the vessel is able to berth and sail without delay by reason of delay payment for such levy, or dues, and or taxes on cargo at load port(s).

Upon receipt of Owners' separate claim invoice with supporting documents, Charterers shall reimburse to Owners the same amount of levy, dues and / or taxes. Banking charge, if any, up to US200 maximum shall be for Charterer's account.

## PART B

### 1. SPEED

Owner guarantees to perform laden voyage at about 12 knots, weather and safe navigation permitting.

### 2. BUNKERS

Owner warrants Vessel is fully bunkered to perform laden voyage.

### 3. HISTORY/RECORD

Vessel has no stranding, grounding, serious accident and / or oil pollution history / record during last 12 months.

### 4. CLEAR SPM FLOATING HOSES

If required by the Charterer's cargo receivers, the Vessel, prior to, during or after discharge, has to clear Single Buoy Moorings' floating hoses by pumping seawater or Vessel's clean ballast water through them. The time thereby consumed shall

FILE COPY

## PART II

1. WARRANTY-VOYAGE-CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | On a voyage to a port or ports in: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) (from ports west of Port Said) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere) |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5. LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving the berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purpose. If cargo is loaded from lighter, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charge for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a) CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 F)(closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a) ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply giving orders to proceed to another port as per Clause 14(a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charterer is to consist only of liquid bulk cargo as specified in Clause I.

17. (a) QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was undiscoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatsoever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bill of Lading issued for the cargo hereunder shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16,

1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge-the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterer within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterer or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expense involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expense.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and one of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires the demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or comingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residues on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expense incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____
on board the _____ Steamship/Motorship _____
whereof _____ is Master, at the port of _____

_____
_____
_____
_____

to be delivered at the port of _____
or so near thereto as the Vessel can safely get, always afloat, unto _____

or order on payment of freight at the rate of _____

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London _____
between _____ and _____, as
Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____
of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

Master

FILE COPY

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
|---|
| Special Provisions and Additional Clauses - Page 1 |

(1) ALL EXPENSES/EQUIPMENTS FOR STS INCLUDING BUT NOT LIMITED TO FENDERS/HOSES/TUGS/PILOTS ETC AND AGENCY FEES TO BE FOR CHARTERERS' ACCOUNT.

(2) CONOCO WEATHER CLAUSE - IF STS/SBM/SPM/LIGHTERING/OPEN SEA BERTH/ SEA LINE/SEA BOUY, CONOCO WEATHER CLAUSE TO APPLY AND TIME TO COUNT IN FULL WEATHER PERMITTING OR NOT. ANY UNBERTHING/REBERTHING DUE TO WEATHER AND/OR SEA CONDITIONS, TO BE AT CHARTERERS' TIME AND EXPENSES.

(3) FPCC ADDITIONAL CLAUSES TO APPLY
I. CHARTERERS TO APPOINT AN INDEPENDENT SURVEYOR ACCEPTABLE BY OWNERS AT LOADPORT AND DISCHARGE PORT TO VERIFY THE QUANTITY AND THE QUALITY OF THE OIL, COST SHALL BE CHARTERERS ACCOUNT.
II. VESSEL NOT TO TENDER N.O.R. PRIOR TO THE COMMENCEMENT OF LAYCAN UNLESS WITH CHARTERERS' PRIOR CONSENT.
III. OWNERS WARRANT VESSEL SHALL BE ABLE TO COMPLY WITH FOLLOWING DISCHARGE (PLEASE CHECK AS PER Q88) PORT RESTRICTION (MAILIAO PORT, TAIWAN).
BERTH W02/W03 :FOR CRUDE OIL

1) LOA : 170 -330 METERS
2) MAXIMUM DRAFT :17.5 METERS
3) LOADING ARMS : 16" X 4
4) WATER DEPTH : 20.6 METERS
5) FREEBOARD IN BALLAST : +3.5 TO +21.0 METERS
6) PARALLEL BODY LENGTH IN BALLAST : MIN 95 METERS
DISTANCE MANIFOLD TO AFORE : MIN 60 METERS
DISTANCE MANIFOLD TO AFT : MIN 35 METERS
OWNERS ALSO CONFIRM THAT :
1) THE VESSEL HAS TO BE EQUIPPED WITH 3 X 16 INCH REDUCERS.
2) CENTER OF MANIFOLD HEIGHT FROM SEA LEVEL UPON COMPLETION OF DISCHARGE SHALL NOT EXCEED 21 METERS
3) THE SALT WATER ARRIVAL MAILIAO PORT'S DRAFT CANNOT EXCEED 17.5 METRES.
4) DISTANCE MANIFOLD CENTRE TO CENTRE SHALL BE BETWEEN 3-3.5 METRES.
(IV) AGENTS CLAUSE: CHARTERER TO NOMINATE AGENTS AT DISCHARGE PORT. SUCH AGENT, ALTHOUGH NOMINATED BY CHARTERER, SHOULD BE EMPLOYED AND PAID FOR BY OWNER, AND CHARTERER SHOULD NOT BE LIABLE FOR ANY DAMAGE AND/OR LOSS DUE TO ANY DISPUTE BETWEEN AGENT(S) AND OWNER, ALWAYS PROVIDED COMPETITIVE.

(4) ANY TAXES/DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

(5) MAXIMUM 3 HOURS AWAITING FOR CARGO DOCUMENTS TO BE FOR OWNERS' ACCOUNT.

(6) Y/A RULES 1974 AMENDED 1994.

(7) FPCC MARINE CLAUSES AND CPC CHARTER PARTY CLAUSES, JUNE 1999 REVISION, AS AMENDED AND ATTACHED TO APPLY.

FILE COPY

M/T BYZANTIO - Charter Party dated 20th March 2003

# FPCC MARINE CLAUSE

1. **ELIGIBILITY CLAUSE**
   Owner warrants that the vessel shall, during the period covered by this Charter, be in full compliance with ISM Code if essential and/or all applicable international conventions, all applicable laws, regulations and/or other requirements of the country of the vessel's registry and of the countries and/or states of the port(s) and/or place(s) to which the vessel may be ordered hereunder.
   Owner further warrants that the vessel shall have on board, during the subject period, all certificates, records or other documents required by aforesaid conventions, laws, regulations and/or requirements.
   If any of the warranties stipulated in this clause are breached, any delay resulting therefrom shall not count as laytime or if the vessel is on demurrage, as time on demurrage and any expense attributable to such delay shall be for Owner's account.

2. **QUESTIONNAIRE CLAUSE**
   It is an express condition precedent to the Charter that (1) The questionnaire 88 shall have been fully completed by the Owner or it's authorized representative, and (2) that Owner's responses to the questionnaire shall be subject to acceptance by the Charterer in it's sole discretion. Owner represents and warrants to Charterer the completeness and accuracy of all information and responses to the questionnaire, which representation and warranty shall be deemed reaffirmed when the vessel tenders Notice of Readiness at the load port. Charterer's acceptance of responses to the questionnaire shall not be deemed to be a waiver of any right Charterer may have. The completed questionnaire shall be deemed attached to and fully incorporated into the Charter.

3. **OIL INSURANCE CLAUSE**
   It is a condition of this Charter that Owner has in place cover for oil pollution of upto the maximum available through the international group of P&I clubs and excess oil pollution cover available through Owner P&I club and/or first class market underwriters. If requested by Charterer, Owner shall immediately furnish to Charterer full and proper evidence of the coverage.

4. **SPILL RESPONSIBILITY CLAUSE**
   Vessel shall take all necessary precautions to prevent spillage or leakage of cargo or bunkers. Prior to commencement of cargo or bunkering operations, vessel shall verify all appropriate overboard lines are closed securely, and shall complete the applicable oil transfer form in conjunction with the terminal or bunkering operator. Furthermore, any time there is any indication of spillage or leakage, vessel shall immediately cease related operations, notify all necessary authorities and involved personnel, conduct a thorough investigation, and complete appropriate action before resuming such operations.

5. **DRUG AND ALCOHOL POLICY CLAUSE**
   Owner warrants that it has a policy on Drug and Alcohol Abuse Policy applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum (OCIMF) Guidelines for the Control of Drugs and Alcohol Onboard Ships.

PAGE 1

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
|---|

## FPCC MARINE CLAUSE

6. BERTH TIME CLAUSE *(deleted)*

7. ETA NOTICE CLAUSE
Owner/Master to give Charterer and MAI LIAO port agent ETA where applicable 7/5/4/3/2/1 days in advance MAI LIAO port. As soon as Owner has had all load/discharge ports nominated on the vessel, Owner to advise Charterer and MAI LIAO port agent of load/discharge port rotation, and the ETA Charterer's port. After having given the load/discharge rotation and ETA to Charterer, Owner then to advise Charterer and MAI LIAO port agent any change of rotation and any change of more than 24 hours of the given ETA.

8. RESPONSIBLE CARE CLAUSE
The Owner is fully committed to the principles of Responsible Care. The Owner acknowledges the importance of handling product in a manner that will ensure the safety of people and the protection of the environment. The Owner agrees they will use, handle, store, transport and dispose of product in accordance with all applicable laws and regulations.

9. PORT RESTRICTION CLAUSE *(deleted)*
Owners warrant that they are fully aware of the physical and operational restrictions at MAI LIAO port, terminals and berths, and will abide by the same. Possible restrictions are included but not limited to, physical limitation on the vessel draft, length, beam, displacement etc., and restrictions on night time cargo operations navigation and/or berthing. Any delay due to non-compliance with restrictions shall be for Owners account.

10. CLEAN BALLAST CLAUSE
Owner warrants that the vessel will arrive at port/area with clean ballast. Nothing, including clean ballast, can be discharged overboard in MAI LIAO port unless otherwise approved. Also Owner warrants that the vessel will comply with ballast water exchange policy of MAI LIAO port when required.

11. SHIP INSPECTION CLAUSE
The Harbor Management, on behalf of Charterer, shall have the right at any time, on reasonable notice, to inspect or survey the vessel with the master or his deputy for the purpose of ascertaining whether the vessel is being maintained and operated in accordance with the terms and conditions of the Charter provided they shall not disturb vessel's safe operation.

12. FITTINGS CLAUSE
    A. Owner warrants that all piping, valves, spools, reducers and other fittings comprising that portion of the vessel's manifold system outboard of the last fixed rigid support to the vessel's deck and are used in the transfer of cargo, bunkers or ballast, will be made of acceptable materials. The fixed rigid support for the manifold system must be designed to prevent both lateral and vertical movement of the manifold.
    B. Owner warrants that all piping, valves, fittings and reducers on the manifold system that are properly prepared in sizes as required and used in the transfer of cargo and ballast will be made of acceptable materials.

PAGE 2

FILE COPY

M/T BYZANTIO - Charter Party dated 20th March 2003

## FPCC MARINE CLAUSE

### 13. CLOSE LOADING/DISCHARGING CLAUSE
Owner warrants that the vessel is equipped for and able to carry out closed loading and discharging operations in full compliance with International Safety Guide for Oil Tanker & Terminal (ISGOTT)..Furthermore Owner warrants that the vessel has an operational closed ullage system available and is capable of venting vapors ashore during loading via single central vapor return line as required.

### 14. CONSIGNEE AGENCY CLAUSE
For strict safety management purpose, Owner agrees to appoint Formosa Plastics Maritime Corporation as their port agent in MAI LIAO Port.

### 15. BUNKERING CLAUSE
For strict safety management purpose, Owner warrants that the vessel shall comply with MAI LIAO Port Bunkering Procedure while bunkering in MAI LIAO Port.

### 16. VESSEL MAINTENANCE CLAUSE
For strict safety management purpose, any repairing work in MAI LIAO Port is prohibited unless permitted by MAI LIAO Port Authority and managed by Formosa Plastics Maritime Corporation. Violated vessel shall be fined.

### 17. CREW MEMBERS SHORE WORK PERMIT CLAUSE
For strict safety management purpose, any shore work by crew members in MAI LIAO Port is prohibited without shore work permit. Violated vessel shall be fined.

### 18. IGS CLAUSE
A) Owner warrants that vessel's Inert Gas System (IGS) is fully operational, and that the vessel will arrive at load port with cargo tanks inerted, and that cargo tanks will remain inerted throughout the voyage, including during loading and discharging, so that in no event shall cargo tanks have an oxygen content in excess of eight percent (8%) by volume.
B) Master may be requested by terminal personnel or independent inspector(s) to breach the IGS for purposes of gauging, sampling, temperature measurement and/or measurement of the quantity of cargo remaining on board after discharge. Breach and depressurization of tanks for such purposes shall be allowed in accordance with the provisions of the most current/amended Inert Gas Systems for Oil Tankers publication issued by the International Maritime Organization (IMO IGS Publication).
C) Owner further warrants that should the IGS system fail, vessel shall strictly adhere to Emergency Procedures of the IMO IGS Publication.
D) Charterer shall have the right to request depressurization under API guidelines of the tanks to allow measurements by designated inspectors, provided local regulatory agencies allow. All time for de-inerting/re-inerting shall be for Charterer's account. Any time lost due to vessel's improper operation of the inert gas system shall be for Owner's account. Any time used solely for such gauging, sampling and measurement shall count as used laytime or, if the vessel is on demurrage, as time on demurrage.

FILE COPY

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
| --- |
| FPCC MARINE CLAUSE |

19. RECEIVING/PUMPING CLAUSE *(deleted), CPC PUMPING CLAUSE TO APPLY*

20. CRUDE OIL WASH CLAUSE *(deleted), VESSEL IS NOT COW FITTED*

M/T BYZANTIO - Charter Party dated 20th March 2003

# CPC MARINE CLAUSE

Part A

1. LAST PORT OF CALL
   Owner warrants that Vessel's last port of call before calling Taiwan is not a port of Mainland China.

2. SCRAPPING
   Owner guarantees that voyage to be performed shall not be last voyage prior to scrapping of the Vessel.

3. ADDRESS COMMISSION
   An address commission, 1.25% on the actual amount of freight/deadfreight/demurrage, to Owners under this Charter Party, shall be directly deducted by Charterers while the payment is made. Apart from the address commission, no other commission/rebate, in cash or in kind, or benefit of any kind, shall be paid to any director, employee or agent of Charterer or any of its affiliates.

4. SLOPS/FREIGHT
   It is understood no freight is payable on slops.

5. UNMOORING/BALLASTING
   After completion of discharge operation Vessel should be unmoored immediately and if it is necessary to take ballast, this should be done at anchorage provided weather and safety permitting.

6. WORLDSCALE REFERENCE
   Worldscale terms and conditions shall apply to this Charter Party. Any costs itemized for Charterer's account shall, unless otherwise instructed by Charterer, be paid by Owner and reimbursed by Charterer against Owner's fully documented claim simultaneously with freight.

7. GENERAL AVERAGE
   York/Antwerp Rules of 1994 to apply.

8. SINGLE POINT MOORING (SPM)
   Owners warrant that Vessel is equipped to load and discharge at SPM per OCIMF recommendations.

9. CLEAN BALLAST
   Vessel to arrive loading port with clean ballast.

10. CLAIMS TIME BAR ............................................................................................. (amended)
    Charterers shall be discharged and released from all liabilities in respect of any claim for demurrage, deviation, deadfreight, and/or any other amounts, which are for Charterer's account under this Charter. Unless a claim in writing with supporting documentation has been presented to Charterers within ninety (90) days *for demurrage claim and 120 days for others* from the date of completion of discharge of cargo.

11. WEST AFRICA LOADPORTS CLAUSE ........................................... (deleted, not applicable)

PART B

1. SPEED .................................................................... about ........................................ (amended)
   Owner guarantees to perform laden voyage at minimum 12 knots, weather and safe navigation permitting.

2. BUNKERS
   Owner warrants Vessel is fully bunkered to perform laden voyage.

3. HISTORY/RECORD
   Vessel has no stranding, grounding, serious accident and / or oil pollution history / record during last 12 months.

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
|---|
| CPC MARINE CLAUSE |

### 4. CLEAR SPM FLOATING HOSES

If required by the Charterer's cargo receivers, the Vessel, prior to, during or after discharge, has to clear Single Buoy Moorings' floating hoses by pumping seawater or Vessel's clean ballast water through them. The time thereby consumed shall count as laytime or, if the Vessel is on demurrage, time on demurrage. Subject to Owners exercising due diligence in carrying out such an operation, Charterers hereby indemnify Owners for any cargo loss or contamination directly resulting from this requirement.

### 5. PUMPING ................................................................................................. *(amended)*

Owner warrants that excluding normal stripping (Max.3 hours) Vessel is capable of discharging her entire cargo within 24 hours or maintaining an average minimum pressure 100 pounds per square inch at Vessel's manifold throughout discharge, if Vessel fails to maintain this discharge rate, Charterer shall not be responsible for any demurrage caused by such failure. Should it become necessary to withdraw Vessel from the berth because of its failure to maintain the discharge rate or maintain the aforesaid Manifold Pressure, all time and expenses directly incurred are to be for Owner's account. With respect to claims made in accordance with Pumping Clause, it is understood that the capabilities of shore facilities to receive cargo will be taken into account when assessing pumping performance. The Terminal shall have the right to gauge discharge pressure at the Vessel's manifold.

### 6. LAYCAN ................................................................................................. *(amended)*

In the event the vessel is berthed before commencement of laydays with Charterers' prior consent, *time to count from all fast*.

In the event the vessel is delayed and berthed after the canceling date without Charter Party cancelled by the Charterers, the laytime used shall start to count from *all fast*

### 7. CARGO RETENTION ................................................................................. *(amended)*

In the event that any liquid, pumpable and reachable by Vessel's fixed equipment in good working conditions cargo remains on board upon completion of discharge, Charterer shall have the right to *claim from the Owners* an amount equal to the FOB port of loading value of such cargo due with respect thereto as determined by an independent surveyor who shall be based in Taiwan and experienced in tanker discharge at Taiwanese ports. The independent surveyor shall be mutually appointed by Owner and Charterer and the parties agree that the independent surveyor shall be instructed to be on board the vessel prior to commencement of discharge and costs to be shared 50/50.

Charterer's failure to exercise its rights under this clause shall be without prejudice to any of its rights and obligations under this Charter. If Owners are liable to any third party in respect of failure to discharge such pumpable cargo, or any part thereof. Charterer shall indemnify Owners against such liability up to the total amount deducted under this clause.

### 8. IGS ................................................................................................. *(deleted, FPCC clause to apply)*

### 9. COW ................................................................................................. *(deleted, Vessel not COW fitted)*

### 10. WAR RISK ................................................................................................. *(amended)*

All additional hull and machinery war risk insurance premium upto H + M value of maximum USD 6 million (Owners please advise) to be for Charterers' account payable against full documentation, Owners only being responsible for basis annual premium, blocking and trapping insurance, crew war bonus and P & I insurance always to be for Owners account. Any discount or rebate refunded to Owners shall be passed on to Charterers.

### 11. WS FLAT RATE ................................................................................................. *(deleted, not applicable)*

### 12. ITOPF AND POLLUTION INSURANCE ................................................................................................. *(amended)*

Owners warrant that:
1. The vessel is a tanker owned by a member of the International Tanker Owners Pollution Federation (ITOPF) Limited and will so remain throughout the Charter party, and
2. The vessel carries on board a valid certificate of insurance as described in the 1969 Civil Liability Convention

PAGE 2

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
|---|
| **CPC MARINE CLAUSE** |

for oil pollution or 1992 Protocols to the same (as and when in force), and

3. The vessel is entered in and shall remain for the duration of this Charter Party a P and I Club, which is the member of the International Group of P and I Clubs, and

4. The vessel has in place insurance cover for oil pollution in an amount of no less than the standard oil pollution cover (currently USD 500 Million) plus additional cover (USD 200 Million), *total one billion* available under the rules of the International Group of P and I Clubs.

The name of P and I Club must be disclosed to Charterers at time of offer. Otherwise Charterers shall have the right to cancel the fixture if vessel's P and I Clubs and/or oil pollution insurance be found unacceptable after date of the fixture. If requested by Charterers, Owners shall immediately furnish to Charterers full and proper evidence of the coverage as per above sub-paragraph 4.

13. OVER AGE INSURANCE .................................................................................... *(amended)*

*Any overage insurance to be for Charterers' account.*

14. DELAYS

Delays to the vessel such as awaiting tide, or daylight, or pilot shall not count as laytime or time on demurrage.

15. B/L INDEMNITY

If original Bill of lading is not available at the discharging port, Charterer or its Agent shall issue a telex or an E-mail Letter of Indemnity per Owner's P and I Club wording and no bank guarantee is required. The parties agree that if all original Bills of Lading are presented to the Master or Vessel's agent, Charterer shall not be required to issue a Letter of Indemnity or bank guarantee whether or not the Vessel is discharging at the port named as discharging port in the Bills of Lading.

16. WEATHER AND FORCE MAJEURE ................................................................. *(amended)*

*CONOCO WEATHER CLAUSE - If STS/SBM/SPM/Lightering/Lightening/Open Sea Berth/Sea Line/SEa Bouy, Conoco weather clause not to apply and time to count in full weather permitting or not. Any unberthing/reberthing due to weather and/or sea conditions, to be at Charterers' time and expenses.*

17. SHIFTING

Time and expenses for shifting from anchorage to first berth and from last berth, to sea to be for Owner's account.

If more than one berth at load at discharge ports is used, shifting time and expenses to be charged as per the following conditions, unless otherwise stipulated in the printed clauses:

(1) For Vessel's reason, all shifting time and expenses, if any, to be for Owner's account.

(2) For Charterer/terminal's reason, all shifting expenses to be for Charterer's account, all time to count as laytime, as demurrage if vessel on demurrage.

(3) For reasons of weather, all shifting expenses to be split 50/50 by Charterers/Owners, all time to count as one-half laytime, as one-half demurrage if vessel on demurrage, except for Sha-Lung discharge, where time to count as per clause 16 "Weather and Force Majeure"

18. RAILED PLATFORM AT BOW ........................................................ *(deleted, not applicable)*

19. ELIGIBILITY AND COMPLIANCE ................................................................. *(amended)*

*To the best of Owners knowledge* that the Vessel is in all respects eligible for trading within, to and from the ports and places specified in Part I (C) and (D); that she shall be in full compliance with all applicable international conventions, all applicable laws and regulations for trading to those locations, and that she shall have on board for inspection by the appropriate authorities all certificates, records, compliance letters and other documents required for such service.

Any delays, losses, expenses or damages arising as a result of failure to comply with this clause shall be for Owner's account and charterer shall not be Liable for any demurrage for delay caused by Vessel's failure to comply with the foregoing warranties.

In the interest of safety, Owners will recommend that the Master observe the recommendations as to traffic separation and routing, which are issued from time to time by the International Maritime Organization (IMO) or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the

FILE COPY

| M/T BYZANTIO - Charter Party dated 20th March 2003 |
|---|

## CPC MARINE CLAUSE

Vessel is exercised.

### 20 CPC MOORING CREW ACCOMMODATION

During the discharging operation via Single Buoy of Mooring (SBM) at Kaohsiung and/or Sha-lung, Taiwan. Charterers shall have the option-at their own risk and expense, to send a mooring team up to 6 persons on board the Vessel to perform the operation of connecting/disconnecting of mooring chains, cargo hose etc. This mooring team shall stand-by onboard during the time that the Vessel is moored to SBM without interfering vessel's normal operation.

Owner shall instruct the Vessel to provide rooms as accommodation of the team for their staying overnight at no cost of room for Charterers' account. Owner will do best endeavor to co-operate on this accommodation.

### 21. ISM CODE COMPLIANCE CLAUSE

(a) Owner warrants Vessel compliance with the International Safety Management (ISM) Code.

(b) Upon request, Owner shall provide Charterer with copies of Document of Compliance (DOC) of the Company (as defined by the ISM code) and Vessel's Safety Management System Certificate (SMSC).

(c) Any loss, damage or expense attributable to Vessel's non-compliance with the ISM Code, and /or to Owner's failure to respond (or delay in responding) to Charterer's request for the foregoing certificates, shall be for Owner's account. And any delays, to the extent arising from such non-compliance or failure/delay in responding, shall not count as laytime or if Vessel is on demurrage, as time on demurrage.

(d) Notwithstanding the foregoing, should Owner fail to provide Chatarer with copies of vessel's DOC and/or SMSC, within such time frame as Charterer may, in its sole discretion, specified in writing, Charterer shall be entitled to cancel this Charter at any time prior to commencement of loading at the first load port, without any Liability whatsoever upon written notice to Owner. Failure to cancel shall not prejudice Charterer's rights and Owner's responsibilities or liabilities under any of the preceding sub-clauses, or under any other provision of this Charter. Cancellation shall be without prejudice to any claims Charterer may have for any resulting loss, damages or expenses.

22. SHELL YEAR 2000 AWARENESS CLAUSE ............................................................. *(deleted)*

FILE COPY

M/T BYZANTIO - Charter Party dated 20th March 2003
Special Provisions and Additional Clauses - Page 1

(1) ALL EXPENSES/EQUIPMENTS FOR STS INCLUDING BUT NOT LIMITED TO FENDERS/HOSES/TUGS/PILOTS ETC AND AGENCY FEES TO BE FOR CHARTERERS' ACCOUNT.

(2) CONOCO WEATHER CLAUSE - IF STS/SBM/SPM/LIGHTERING/OPEN SEA BERTH/ SEA LINE/SEA BOUY, CONOCO WEATHER CLAUSE NOT TO APPLY AND TIME TO COUNT IN FULL WEATHER PERMITTING OR NOT. ANY UNBERTHING/REBERTHING DUE TO WEATHER AND/OR SEA CONDITIONS, TO BE AT CHARTERERS' TIME AND EXPENSES.

(3) FPCC ADDITIONAL CLAUSES TO APPLY
   I. CHARTERERS TO APPOINT AN INDEPENDENT SURVEYOR ACCEPTABLE BY OWNERS AT LOADPORT AND DISCHARGE PORT TO VERIFY THE QUANTITY AND THE QUALITY OF THE OIL, COST SHALL BE CHARTERERS' ACCOUNT.
   II. VESSEL NOT TO TENDER N.O.R PRIOR TO THE COMMENCEMENT OF LAYCAN UNLESS WITH CHARTERER'S PRIOR CONSENT.
   III. OWNERS WARRANT VESSEL SHALL BE ABLE TO COMPLY WITH FOLLOWING DISCHARGE (PLS CHECK AS PER Q88) PORT RESTRICTION (MALIAO PORT, TAWIAN) BERTH W02/W03 : FOR CRUDE

   1) LOA: 170-330M METRES
   2) MAXIMUM DRAFT: 17.5 METRES
   3) LOADING ARMS: 16" X 4
   4) WATER DEPTH: 20.6 METRES
   5) FREEBOARD IN BALLAST : +3.5 TO +21.0 METRES
   6) PARALLEL BODY LENGTH IN BALLAST CONDITION: MIN 95 METRES
      DISTANCE MANIFOLD TO AFORE: MIN 60 METRES
      DISTANCE MANIFOLD TO AFT   : MIN 35 METRES
   OWNERS ALSO CONFIRM THAT:
   1) THE VESSEL HAS TO BE EQUIPPED WITH ANSI 3*16 INCH REDUCERS
   2) CENTRE OF MANIFOLD HEIGHT FROM SEA LEVEL UPON COMPLETION OF DISCHARGE SHALL NOT EXCEED 21 METRES
   3) THE SALT WATER ARRIVAL MAILIAO PORT'S DRAFT CAN NOT EXCEED 17.5 METRES
   4) DISTANCE MANIFOLD CENTER TO CENTER SHALL BE BETWEEN 3-3.5 METRES  - AS PER JAPANESE APPENDIX -

   IV. AGENTS CLAUSE:
   CHARTERER TO NOMINATE AGENTS AT DISCHARGE PORT. SUCH AGENT, ALTHOUGH NOMINATED BY CEARTERER, SHOULD BE EMPLOYED AND PAID FOR BY OWNER, AND CHARTERER SHOULD NOT BE LIABLE FOR ANY DAMAGE AND/ OR LOSS DUE TO ANY DISPUTE BETWEEN AGENT(S) AND OWNER, ALWAYS PROVIDED COMPETITIVE.

(4) ANY TAXES/DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND TO BE SETTLED DIRECTLY BY THEM.

(5) FPCC MARINE CLAUSES AND CPC CHARTER PARTY CLAUSES, JUNE 1999 REVISION, AS AMENDED AND ATTACHED TO APPLY.

*[handwritten: Max 3 hours awaiting [illegible] NOR ddcc only [illegible] on ttl.]*
*[handwritten: Y/P rules 1974 Amended 1994]*

Association of Ship Brokers
& Agents (U.S.A.), Inc.
October 1977

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

_____
Place                                           Date

IT IS THIS DAY AGREED between _____

chartered owner/owner (hereinafter called the "Owner") of the _____

SS/MS _____ (hereinafter called the "Vessel")

and _____ (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A. Description and Position of Vessel:

Deadweight:              tons (2240 lbs.)          Classed:

Loaded draft of Vessel on assigned summer freeboard          ft.          in. in salt water.

Capacity for cargo:                    tons (of 2240 lbs. each)    % more or less, Vessel's option.

Coated:        ☐ Yes        ☐ No

Coiled:        ☐ Yes        ☐ No                               Last two cargoes:

Now:                                                            Expected Ready:

B. Laydays:
   Commencing:                                                  Cancelling:

C. Loading Port(s):                                                                    Charterer's Option

D. Discharging Port(s):                                                                Charterer's Option

E. Cargo:                                                                              Charterer's Option

F. Freight Rate:                                              at                       per ton (of 2240 lbs. each).

G. Freight Payable to:

H. Total Laytime in Running Hours:

I. Demurrage per day:

J. Commission of         % is payable by Owner to
on the actual amount of freight, when and as freight is paid.

K. The place of General Average and arbitration proceedings to be London/New York (strike out one).

L. Tovalop: Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M. Special Provisions: