HCAJ 92/ 2004

IN THE HIGHT COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ADMIRALTY ACTION NO. 92 OF 2004

Admiralty action *in rem* against the ship or Vessel *"BYZANTIO"* of the Malta Flag

B E T W E E N

FORMOSA PETROCHEMICAL CORPORATION

First Plaintiff

THE OWNERS OF AND/OR OTHER PERSONS ENTITLED TO SUE IN
RESPECT OF THE CARGO LATELY LADEN ON BOARD
THE SHIP OR VESEL *"BYZANTIO"*

Second Plaintiff

- and -

THE OWNERS AND/OR DEMISE CHARTERERS OF
THE SHIP OR VESSEL *"BYZANTIO"*

Defendants

---

DEFENCE AND COUNTERCLAIM

---

1.    Save were expressly stated to the contrary:-

    1.1    the Defendants will adopt the same defined terms used by the
           Plaintiff in the Statement of Claim; and

    1.2    paragraph numbers referred to herein are to paragraphs of the
           Statement of Claim.

2.    Save as hereinafter specifically admitted or not admitted the Defendants deny

each and every allegation contained in the Statement of Claim as if the same were set out herein and separately traversed.

3.    The Defendants admit Paragraphs 1 to 3.

4.    As for Paragraph 4, the Defendants deny the existence of the implied term in the Charterparty that *"the loading of the cargo by ship to ship transfer would be carried out by the Defendants safely and in accordance with the provisions of the Ship to Ship Transfer Guide (Petroleum)(Third Edition 1997)."*

5.    Save that the First Plaintiff ordered the Vessel to load a cargo of about 48,000 mt of Kuwait Export Crude Oil, paragraph 5 is admitted.

6.    As for Paragraph 6, these facts are outside the Defendants knowledge and are therefore not admitted.

7.    The Defendants admit Paragraph 7.

8.    As for Paragraph 8, it is admitted that the Vessel loaded 24,593 mt of cargo. It is further admitted that the Vessel did not proceed to the discharge port and that the 24,593 of cargo loaded on board the Vessel was discharged OPL Hong Kong. Save as aforesaid, Paragraph 8 is denied.

9.    As for Paragraph 9, it is admitted that at about 0315 hours there was an explosion, and then immediately afterwards a second explosion, forward in way of the forecastle of the Vessel followed by a fire. The pumpman on the Vessel was killed and AB Carballo suffered burns. OS Vicencio suffered severe burns and later died from his injuries. The explosions, fire and flying debris caused substantial damage to the Vessel. The Defendants will say that the explosions (and subsequent fire) were caused by the accumulation of flammable cargo vapours on the deck of the Vessel and in way of the forecastle store and the hydraulic pump room. Save as aforesaid, all but the last sentence of Paragraph 9 is denied. The last sentence of Paragraph 9 is admitted.

10.    As to paragraph 10, the Defendants admit that the previous cargo carried by the Vessel was crude oil and that the tanks were not washed since carrying that cargo. The rest of Paragraph 10 is denied.

11.    The Charterparty, to which the Defendants will refer for its full terms and true meaning and effect, provides as follows:-

"PART II

1.    *WARRANTY – VOYAGE – CARGO*

*The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch*

proceed as ordered to Loading Port(s) named in accordance with Clause 4

hereof, or so near thereunto there onto where she may safely get (always

afloat), and being seaworthy, having all pipes and pumps and heater coils in

good working order, and being in every respect fitted for the voyage, so far as

the foregoing conditions can be attained by the exercise of due diligence,

perils of the sea and any other cause of whatsoever kind beyond the Owners'

and/or Master's control excepted, shall load (always afloat) from the factors

of the Charterers a full and complete cargo of petroleum and/or its products

in bulk, not exceeding what she can reasonably stow and carry ...


10.     PUMPING IN AND OUT

The cargo shall be pumped into the Vessel at the expense, risk and peril of the

Charterers, ...


19.     GENERAL EXCEPTIONS CLAUSE

The Vessel, her Master and Owner shall not, unless otherwise in this Charter

expressly provided, be responsible for any loss or damage, or delay or failure

in performing hereunder, arising or resulting from:- any act, neglect, default

or barratory of the Master, Pilot, Mariner or other servants of the Owner in

the navigation or management to the Vessel; fire, unless caused by the

personal design or neglect of the Owner; collision, stranding or peril, danger

or accident of the sea or other navigable waters; saving or attempting to save

life or property; wastage in weight or bulk, or any other loss or damage

arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; ...; explosion, ..., or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or the Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performance hereunder, arising or resulting from:- Act of God;...; perils of the seas,...

20(b)(i) CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, Ordinance or Legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provision of such Act, Ordinance or Legislation.

SPECIAL PROVISION AND ADDITIONAL CLAUSE AT PAGE 1

(i)     all expenses /equipment for STS including but not limited to

*fenders, hoses, tugs, pilots etc. and agency fees to be for*

*Charterers' account. "*

12.   The material provisions of Hague Rules and/or US GOGSA are identical and

provide as follows:-

*"Article 3*

1.   *The carrier shall be bound before and at the beginning of the voyage to exercise*

*due diligence to –*

   (a)  *Make the ship seaworthy;*

   (b)  *Properly man, equip and supply the ship;*

   (c)  *Make the holds, refrigerating and cool chambers and all parts of the ship*

*in which goods are carried, fit and safe for their reception, carriage and*

*preservation.*

*Article IV*

1.   *Neither the carrier nor the ship shall be responsible for loss or damage arising*

*or resulting from unseaworthiness unless caused by want of due diligence on*

*the part of the carrier to make the ship seaworthy . . .*

2.   *Neither the carrier nor the ship shall be responsible for loss or damage arising*

*or resulting from:-*

   (a)     *Act, or neglect, or default, of the master, mariner, pilot, or the*

*servants of the carrier in the navigation or in the management of the ship.*

(b)    *Fire, unless caused by the actual fault or privity of the carrier,*

(i)    *Act or omission of the shipper or owner of the goods, his agent or representative.*

(q)    *Any other cause arising without the actual fault or privity of the carrier, or without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss."*

13.    Further or alternatively it was an implied term of the Charterparty (such a term being implied from the express terms thereof and/or in order to give business efficacy to the contract and/or on the grounds of obviousness and/or as a matter of law) that the Charterers were responsible for the loading and/or pumping of the cargo from the *Asian Progress II (APII)* to the Vessel.

14.    Further or alternatively it was an implied term of the Charterparty (such a term being implied from the express terms thereof and/or in order to give business efficacy to the contract and/or on the grounds of obviousness and/or as a matter of law) that that the pumping of the cargo from the *APII* to the Vessel would be conducted by and/or controlled by the Charterers and/or

their servants and/or their agents and/or their employees with reasonable care and skill.

15.  Further or alternatively, it was an implied term of the Charterparty (such a term being implied from the express terms thereof and/or in order to give business efficacy to the contract and/or on the grounds of obviousness and/or as a matter of law) that Charterers would ensure that the loading and/or pumping of the cargo from the *APII* to the Vessel was conducted safely and in accordance with the Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997).

16.  The Defendants will say that the Vessel was seaworthy.

## PARTICULARS

16.1  The Vessel's class was maintained throughout the material time;

16.2  The Vessel's statutory certificates were up to date and in force at the material time;

16.3  All the officers and crew held the requisite valid certification; and

16.4  The vessel was tight, staunch and subjected to regular maintenance by the crew.

17.  In the alternative if, which is denied, the Vessel is held to have been

unseaworthy in any respect, the Defendants exercised due diligence before and at the beginning of the voyage to make the Vessel seaworthy, and to make the holds and all other parts of the Vessel safe for the reception, carriage and preservation of the cargo.

## PARTICULARS

17.1    The Defendants repeat paragraph 16.1 – 16.4 of the Defence.

18.    The Defendants reserve the right to plead further with regard to seaworthiness and the exercise of due diligence to make the vessel seaworthy once proper particulars of any alleged unseaworthiness are provided by the Plaintiffs.

19.    Further and in the alternative, any loss or damage suffered by the Plaintiffs was caused by any other cause of whatsoever kind arising without the actual fault or privity of the Owners within the meaning of Clause 19 Part II of the Charter and/or without the actual fault or privity of the carrier within the meaning of section 1304 paragraph 2(q) of US COGSA and/or without the actual fault or privity of the carrier within the meaning of Article IV Rule 2(q) of the Hague rules.

20.    Further and in the alternative, any loss or damage suffered by the Plaintiffs

was caused by any other cause of whatsoever kind arising without the fault or neglect of the agents or servants of the carrier within the meaning of section 1304 paragraph 2(q) of US COGCSA and/or within the meaning of Article IV Rule 2(q) of the Hague Rules.

21.    Further and in the alternative, any loss or damage suffered by the Plaintiffs was caused by fire without the personal design or neglect of the owner within the meaning of Clause 19 Part II of the Charterparty.

22.    Further and in the alternative, any loss or damage suffered by the Plaintiffs was caused by fire without the actual fault or privity of the carrier, within the meaning of section 1304 paragraph 2(b) of US COGSA and/or within the meaning of Article IV Rule 2(b) of the Hague Rules.

23.    Further and in the alternative, any loss or damage suffered by the Plaintiffs was caused by an explosion within the meaning of Clause 19 Part II of Charterparty.

24.    Further and in the alternative, any loss or damage suffered by the Plaintiffs was caused by the act or omission of the shipper or owner of the goods, his agent or representative within the meaning of section 1304 paragraph 2(i) of US COGSA and/or within the meaning of Article IV Rule 2(i) of the Hague Rules.

25.   Further and in the alternative if, which is denied, any loss or damage suffered by the Plaintiff was caused by any act neglect or default of the master, pilot, mariner or other servants of the Owner, then such neglect or default was in the navigation or management of the Vessel within the meaning of Clause 19 Part II of the Charterparty.

26.   Further and in the alternative if, which is denied, any loss or damage suffered by the Plaintiff was caused by the act or default or neglect of the master, mariner, pilot or the servants of the carrier then such act or default or neglect was in the navigation or management of the ship within the meaning of Article IV Rule 2(a) of the Hague Rules and/or within the meaning of section 1304 paragraph 2(a) of US COGSA.

27.   The Defendants will say that The Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997) provides at Section 1.4 that:-

> "The overall control of an STS transfer operation should be vested in the hands of one individual (person in overall advisory control) and will be either one of the masters concerned, or an STS superintendent. If masters are unfamiliar with, or inexperienced in STS transfer operations, it is recommended that an STS superintendent be employed to advise them".

28. The Plaintiffs, as the common charterers of both the *APII* and the Vessel, placed an STS superintendent as their servant or agent or employee on the Vessel to be in overall control of the STS operation. In so doing, the Charterers assumed responsibility for the overall control of the STS operation through their servant, employee or agent, the STS superintendent.

29. It is denied that the explosion or explosions or any loss, damage or expense allegedly suffered by the Plaintiffs was caused by the Defendants' breach of the Charterparty as alleged in Paragraph 10, or otherwise. In fact the explosion or explosions were caused by the breach of the Charterparty by the Plaintiffs, their employees, servants or agents in that they failed to conduct and/or supervise and/or control the pumping of the cargo from the *APII* to the Vessel with reasonable care and skill, and/or failed to ensure that the loading and/or pumping of the cargo from the *APII* to the Vessel was conducted safely and in accordance with the Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997).

## PARTICUALRS OF BREACH OF CONTRACT

29.1 Charterers, their servants and/or agents and/or employees failed to detect the presence of an explosive quantity of cargo vapours accumulating on the Vessel.

29.2 Charterers, their servants and/or agents and/or employees failed to

monitor the vapour levels on the deck of the Vessel to determine whether dangerous amounts of flammable cargo vapours were accumulating at deck level.

29.3    Charterers, their servants and/or agents and/or employees failed to monitor the change of the positioning of the *APII* and the Vessel (collectively, "the Vessels") relative to the prevailing wind conditions.

29.4    Charterers, their servants and/or agents and/or employees failed to detect and/or appreciate the significance of the changes in the freeboard differential between the Vessels.

29.5    Charterers, their servants and/or agents and/or employees failed to detect that the relative positioning of the *APII* could develop a lee over the deck of the Vessel.

29.6    Charterers, their servants and/or agents and/or employees failed to detect the development of a lee and failed to require the *APII* to take corrective action.

29.7    The STS superintendent retired to bed at about 0100 hours without having given appropriate instructions regarding the STS operation and, in particular, the positioning of the Vessels and the risk of the accumulation of flammable cargo vapours aboard the Vessel.

29.8    The STS superintendent failed to take rest when the opportunity presented itself at an earlier stage in the operation.

29.9    The STS superintendent went to bed at a time when it was unsafe to do so or at a time when it would have been apparent to a competent

STS superintendent that the operation was likely to become unsafe in the near future.

29.10   Charterers, their servants and/or agents and/or employees failed to monitor the loading rate and thereby failed to ensure that the agreed loading rate was not exceeded.

29.11   Charterers, their servants and/or agents and/or employees failed to take any or any adequate action to prevent the build up of flammable cargo vapours aboard the Vessel.

29.12   Charterers, their servants and/or agents and/or employees failed to maintain any or an adequate watch over the STS cargo transfer operation.

29.13   The STS superintendent, as Charterers servant and/or agent and/or employee failed to discharge his duties and obligations as the person in overall charge of the cargo transfer operation with reasonable care and skill and/or to the standard required of a competent STS superintendent.

29.14   Charterers, their servants and/or agents and/or employees failed to observe and/or apply the provisions of the Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997).

29.15   Charterers, their servants and/or agents and/or employees failed to check and/or comply with local regulations and/or obtain local approval for the STS operation.

29.16   Charterers, their servants and/or agents and/or employees failed to

notify the local authority and/or relevant government agencies that the STS operation was about to begin within their territorial waters.

29.17   Charterers, their servants and/or agents and/or employees instructed the Vessel to anchor in the Lema Channel in breach of local regulations.

29.18   Charterers, their servants and/or agents and/or employees ordered the Vessel to discharge her cargo in a non-permitted exclusionary zone.

29.19   The STS superintendent appointed by the Charterers as their servant, agent or employee was not competent.

30.    Further or alternatively the Defendants will say that the explosion or explosions or any loss, damage or expense allegedly suffered by the Plaintiffs was caused by the negligence of the STS superintendent (and those vicariously responsible for his actions).

## PARTICULARS OF NEGLIGENCE

30.1   He failed to detect the presence of an explosive quantity of cargo vapours accumulating on the Vessel.

30.2   He failed to monitor the vapour levels on the deck of the Vessel to determine whether dangerous amounts of flammable cargo vapours were accumulating at deck level.

30.3   He failed to monitor the change of the positioning of the Vessels

relative to the prevailing wind conditions.

30.4    He failed to detect and/or appreciate the significance of the changes in the freeboard differential between the Vessels.

30.5    He failed to appreciate that the relative positioning of the *APII* could develop a lee over the deck of the Vessel.

30.6    He failed to detect the development of a lee and failed to require the *APII* to take corrective action.

30.7    He retired to bed at about 0100 hours without having given appropriate instructions regarding the STS operation and, in particular, the positioning of the Vessels and the risk of the accumulation of flammable cargo vapours aboard the Vessel.

30.8    He failed to take rest when the opportunity presented itself at an earlier stage in the operation.

30.9    He went to bed at a time when it was unsafe to do so or at a time when it would have been apparent to a competent STS superintendent that the operation was likely to become unsafe in the near future.

30.10   He failed to monitor the loading rate and thereby failed to ensure that the agreed loading rate was not exceeded.

30.11   He failed to take any or any adequate action to prevent the build up of flammable cargo vapours aboard the Vessel.

30.12   He failed to maintain any or an adequate watch over the STS cargo transfer operation.

30.13   He failed to discharge his duties and obligations as the person in

overall charge of the cargo transfer operation with reasonable care and skill and/or to the standard required of a competent STS superintendent.

30.14  He failed to observe and/or apply the provisions of the Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997).

30.15  He failed to check and/or comply with local regulations and/or obtain local approval for the STS operation.

30.16  He failed to notify the local authority and/or relevant government agencies that the STS operation was about to begin within their territorial waters.

30.17  He instructed the Vessel to anchor in the Lema Channel in breach of local regulations.

30.18  He permitted the Vessel to discharge in a non-permitted, exclusionary zone.

30.19  He was not competent.

31.  The Plaintiffs also placed a Mr Koo on board the Vessel as their servant, agent or employee. The Defendants will say that the explosion or explosions or any loss, damage or expense allegedly suffered by the Plaintiffs was caused by the negligence of the Mr Koo (and those vicariously responsible for his actions).

## PARTICULARS

31.1    Mr Koo failed to ensure that the agreed maximum loading rate was not exceeded; and

31.2    Mr Koo failed to monitor the loading rate properly or at all.

31.3    Mr Koo failed to ensure that the STS superintendent observed and/or applied the provisions of the Ship to Ship Transfer Guide (Petroleum) (Third Edition 1997).

31.4    Mr Koo instructed the Vessel and the APII to load and discharge cargo at a rate in excess of the agreed maximum loading rate recorded in the Loading Operation Information Exchange Form.

32.    No admissions are made as to Paragraphs 11 and 12.

33.    It is denied that the Plaintiffs are entitled to the relief claimed, or any relief. Accordingly Paragraphs 13 and 14 are denied.

## COUNTERCLAIM

34.    The Defendants repeat paragraphs 1 to 33 hereof.

35.    By reason of the matters set out above the Defendants have suffered loss and damage and incurred expense.

## PARTICULARS OF LOSS

35.1    Losses and expense for personal injury and/or death of the crew, hull damage, repairs and associated expenses, loss of use, claims by the Chinese Authorities and Guangzhou Salvage totalling US$3,319,128.59 as further particularised in the attached Schedule.

35.2    The sum paid to the Owners of the *APII* in settlement of the inter-ship claim in the sum of US$2,300,000.

35.3    The legal costs incurred in the inter-ship claim involving the *APII* in the sum of US$550,000.

36.    Further, the Defendants are entitled to and claim interest pursuant to Sections 48 and 49 of the High Court Ordinance (Cap. 4)

AND the Defendants counterclaim:-

(1)    Damages in the sum of US$3,319,128.59;

(2)    An indemnity in the sum of US$2,850,000;

(3)    Interest pursuant to Sections 48 and 49 of the High Court Ordinance (Cap. 4) or at such rate or rates and for such periods as the Court shall provide; and

(4)     Costs.

Dated this 12th day of April 2007.

Ince & Co

Solicitors for the Defendants

HCAJ 92/ 2004

IN THE HIGHT COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
COURT OF FIRST INSTANCE
ADMIRALTY ACTION NO. 92 OF 2004
Admiralty action *in rem* against the ship or Vessel
*"BYZANTIO"* of the Malta Flag

B E T W E E N

FORMOSA PETROCHEMICAL CORPORATION

First Plaintiff

THE OWNERS OF AND/OR OTHER PERSONS ENTITLED
TO SUE IN RESPECT OF THE CARGO LATELY LADEN
ON BOARD THE SHIP OR VESEL *"BYZANTIO"*

Second Plaintiff

- and -

THE OWNERS AND/OR DEMISE CHARTERERS OF
THE SHIP OR VESSEL *"BYZANTIO"*

Defendants

---

DEFENCE AND
COUNTERCLAIM

---

Served this 12th day of April 2007.

Filed this 12th day of April 2007.

Messrs. Ince & Co.
Solicitors for the Defendants
Room 3801-6, 38th Floor
ICBC Tower
Citibank Plaza
3 Garden Road
Hong Kong
Tel : 2877 3221
Fax : 2877 2633
Ref: MC/RMcF (06.6218)